**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- X

JANE DOE 1[1],                          :

                                    :               Civil Action No.: 22-cv-00113

                    Plaintiff,     :

                                      :

                    v.            :               **COMPLAINT**

                                      :

MCADAM FINANCIAL GROUP LLC, and  :

CHARLES NORFLEET, in his individual and  :          <u>**Jury Trial Demanded**</u>

professional capacity,               :

                                      :

                    Defendants.  :

-------------------------------------------------------- X

       Plaintiff Jane Doe 1 ("Plaintiff") by and through her attorneys, Wigdor LLP, as and for her

complaint against Defendants McAdam Financial Group LLC ("McAdam Financial" or the

"Company") and Charles Norfleet ("Norfleet") in his individual and professional capacity,

(collectively, "Defendants") hereby alleges as follows:

<u>**SUMMARY OF CLAIMS**</u>

       1.     The #MeToo movement's heightened awareness about violence against women,

including and especially at the workplace, changed nothing for young female employees who work

at McAdam Financial.

       2.     Founded by Michael McAdam in 2014, the growing financial advisory firm boasted

in 2020 it had approximately $829.7 million of assets under management and served approximately

5,494 clients.

---

[1]    As detailed below, the woman identified as Jane Doe 1 is a victim of sexual assault and, as such, will be identified only under this pseudonym. Similarly, in the context of sexual and physical touchings by Norfleet of other female employees, their names will be identified only as "Jane Doe."

3.       Shockingly, this same company, McAdam Financial, overlooked a sexual predator in its midst despite overt warning signs of his behavior.  McAdam Financial's decision to recklessly ignore this male employee's dangerous conduct is inexcusable.  It also is unlawful.

4.       Worse, Norfleet worked in a supervisory capacity at McAdam Financial.

5.       Plaintiff Jane Doe 1, a former entry level financial advisor at McAdam Financial, was raped by a supervisor in the Boston office, Charles Norfleet, when 18 employees went on a Company-sponsored outing to celebrate the firm's achievement of internal financial goals.  The "outing" was excessive alcohol consumption at local bars paid for with the money earned by reaching these financial goals.

6.       After being plied with alcohol and likely slipped a date rape drug, Ms. Doe 1 went in and out of consciousness, and then into a blackout state that night.  Horrifically, Ms. Doe 1 awoke the next morning to find herself naked in Norfleet's bed.  Ms. Doe 1 had not consented to having sex with Norfleet.  Indeed, in her compromised mental state, Ms. Doe 1 was not capable of giving consent.

7.       Tragically, Norfleet raped her again that morning.  In shock and total confusion, Ms. Doe 1 fled Norfleet's apartment.

8.       Appallingly, Ms. Doe 1 was not Norfleet's first rape victim.  In a shockingly similar fact pattern, just *two weeks* before Ms. Doe 1 was raped by Norfleet, another female employee at McAdam Financial, Jane Doe 2, experienced sexual assault and rape by Norfleet.

9.       Following a McAdam Financial sponsored "kickball game," that also involved alcohol, Ms. Doe 2 was plied alcohol and also likely slipped a date rape drug.  Sadly similar to what happened to Ms. Doe 1, Ms. Doe 2 slipped in and out of consciousness and eventually blacked out, only to wake up the next morning, naked, in Norfleet's bed, knowing she had been raped, but not knowing how she got there.  Norfleet also raped Ms. Doe 2 the next morning.

2

10.     Somehow, Ms. Doe 1 garnered the courage to report Norfleet to another male manager in the Boston office.

11.     In an outrageous and shameful manner, Ms. Doe 1 was forced to recount her sexual assault and rape nightmare to not one male superior, not two male superiors, but no less than three male supervisors, all older and in positions of authority relative to Ms. Doe 1.  She was forced to recount the events to these three men before McAdam Financial deemed the "reporting" complete.

12.     No woman should have to choose between gainful employment and being raped.

13.     That Norfleet's reputation among female employees was epically "creepy", and he was notorious for touching, grabbing and feeling them up during the course of his three-year employment at the Company is frightening and detestable.  The fact that Norfleet was a top producing manager for McAdam Financial's Boston office should not matter when it comes to protecting the safety of other employees, yet it is undeniable that during his three years of employment at McAdam Financial Norfleet had not been held accountable for his known propensity of physically grabbing, touching and groping female employees at Company events.

14.     By this action, Ms. Doe 1 will hold McAdam Financial and Norfleet accountable for the extreme and reckless physical and emotional harm that they caused her to experience.

**ADMINISTRATIVE PROCEDURES**

15.     Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and received her Notice of Right to Sue for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII") on January 3, 2022.

16.     This action is commenced within the relevant EEOC time limitations.

17.     Pursuant to NYCHRL § 8-502, Plaintiff will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel, thereby satisfying the notice requirements of that section.

18.     All other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

19.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Title VII.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under State and local law pursuant to 28 U.S.C. § 1367(a).

20.     Venue is proper in this County pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including employment practices alleged herein, occurred in this district.

## PARTIES

21.     Plaintiff Jane Doe 1 is a former employee of McAdam Financial Group LLC.  Ms. Doe 1 resides in New York, New York.  At all relevant times, Ms. Doe 1 met the definition of an "employee" and/or "eligible employee" under all applicable statutes.

22.     Defendant McAdam Financial Group LLC is a financial advisor with offices in Philadelphia, Pennsylvania, Tysons Corner, Virginia, Chicago, Illinois and Boston, Massachusetts. McAdam Financial Group LLC was formed and exists under the laws of Delaware, and is registered as a foreign limited liability company with the New York Department of State.  Michael McAdam is the principal member of the LLC.  At all relevant times, McAdam Financial met the definition of "employer" and/or "covered employer" under all relevant statutes.

23.     Defendant Charles Norfleet worked in a management position for Defendant McAdam Financial Group LLC.  Defendant Norfleet resides in Boston, Massachusetts.  At all

4

relevant times, Defendant Norfleet met the definition of "employer" and/or "covered employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

### I.   McAdams Financial

24.     McAdam Financial is a private registered investment advisor, founded by Michael McAdam ("McAdam") in 2014.  The Company operates out of four main offices in Philadelphia, Boston, Chicago, and Tysons Corner.  McAdam Financial uses a proprietary investment model called the Advanced Advisory Model.[2]

25.     In 2020, McAdam Financial advertised that it had approximately $829.7 million of assets under management and serves approximately 5,494 clients.[3]

26.     In an effort to attract employees, the Company's recruitment materials claim that it provides "mentorship, guidance,[4] and support"[5] for new hires and young professionals who join. It also advertises that it won a 2018 "Employer of the Year" Stevie Award for Great Employers.[6] According to its founder, Michael McAdam, "[McAdam Financial] ha[s] one of the best networks of advisors in the country."[7]

27.     Notably, McAdam Financial attributes its success to "strong values and reputation for doing business the right way."[8]  These firm values include:

- Commitment;

---

[2]     https://www.linkedin.com/company/mcadam-financial-group/about/
[3]     https://money.usnews.com/financial-advisors/firm/mcadam-llc-170914
[4]     https://mcadamfa.com/join-our-team/
[5]     https://mcadamfa.com/wp-content/uploads/2019/04/McAdam_Recruiting_Brochure_-Digital_2019_04-002.pdf
[6]     https://www.linkedin.com/company/mcadam-financial-group/
[7]     https://mcadamfa.com/wp-content/uploads/2019/04/McAdam_Recruiting_Brochure_-Digital_2019_04-002.pdf, p. 5.
[8]     https://mcadamfa.com/wp-content/uploads/2019/04/McAdam_Recruiting_Brochure_-Digital_2019_04-002.pdf, p. 5.

- Competition;

- Personal Responsibility; and

- Growth Orientation.[9]

28.    McAdam Financial lists their seven vital leadership attributes as: Integrity, Empathy, Emotional Intelligence, Vision, Judgement, Courage, Passion.[10]

29.    When Ms. Doe 1 was hired, she was excited to join a company that she believed would offer her the opportunity to learn, grow and adhere to these purported values and attributes.

30.    Sadly, she had no idea that her personal safety was disproportionately at risk.

31.    Despite the Company's self-proclaimed values and leadership attributes, no one at McAdam Financial made Norfleet "personally responsible" for his conduct even though numerous employees, including other managers, knew about his sexually inappropriate behavior.

32.    As described below, McAdam Financial's treatment of Ms. Doe 1 following her reporting of Norfleet was anything but empathetic.  Retaliating against a victim of sexual assault because she dares to report what happened is the opposite of the leadership qualities McAdam Financial claims to govern itself by.

33.    Indeed, the re-victimization of Ms. Doe 1 which forced her out of the Company is precisely why incidents of rape and sexual assault continue to go grossly under-reported in the U.S.[11]

---

[9]    https://mcadamfa.com/wp-content/uploads/2019/04/McAdam_Recruiting_Brochure_-Digital_2019_04-002.pdf, p. 11.
[10]   https://mcadamfa.com/wp-content/uploads/2019/04/McAdam_Recruiting_Brochure_-Digital_2019_04-002.pdf, p. 11.
[11]   In 2020, only 22.9% of sexual assault victims reported the crime to the police according to the National Crime Victimization Survey conducted by the Bureau of Justice Statistics. https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/cv20.pdf, p. 7.

II.   **Ms. Doe 1's Employment**

34.   In June 2020, after graduating college, Ms. Doe 1 started work at McAdam Financial as a financial advisor.  She was 22.

35.   At the time her employment began, because of the Covid-19 pandemic, she worked remotely.

36.   As an entry level financial advisor, Ms. Doe 1 reported to District Manager Aaron Swenson ("Swenson"), 25.

37.   Norfleet, then age 25, also was in a supervisory position above entry level financial advisors such as Ms. Doe 1.  Specifically, Norfleet, whose title was "Lead Senior Manager," ran regular meetings for the entry level financial advisors.  On a weekly basis, Ms. Doe 1 interacted with Norfleet, especially in connection with these meetings.  She also worked with him as part of the ordinary course of business as Norfleet's role involved helping new advisors such as Ms. Doe 1 learn sales techniques.  Norfleet would critique her sales skills and help her improve.  As described below, he even helped her gain new clients and therefore helped her advance at the Company.

38.   Norfleet started at McAdam Financial in May 2017.  At all times, he and Swenson worked from the Boston office.

39.   Also working with Norfleet and Swenson in the Boston office were Senior Manager Ian Helmus, 25, and District Manager Davis Wilson, 26.

III.   **The Sexually-Charged, Discriminatory and Hostile Work Environment**

40.   Although many employees worked remotely during the pandemic, Zoom meetings, group calls and group chats took place daily, allowing for Ms. Doe 1 to get to know other employees, including female employees that worked in the Boston office.  A number of these female employees, before Covid-19, had worked in person with Norfleet.

7

41.     Not long after she started, Ms. Doe 1 learned from female co-workers that Norfleet had a "reputation."

42.     Specifically, female employees openly talked about Norfleet's blatantly inappropriate behavior towards women.  This conduct, which Norfleet clearly took no effort to conceal, and employees witnessed and talked about it openly, included *inter alia*: making sexualized comments to his subordinate female employees, grabbing and physically touching female employees when employees were out at events and even groping a female co-worker.

43.     As one female co-worker said to Ms. Doe 1, Norfleet was "creepy" towards women.

44.     Ms. Doe 1 was told about specific incidents involving Norfleet by female co-workers, including one co-worker who said that Norfleet had grabbed her around the waist inappropriately, and another who said that Norfleet had "felt her up."

45.     Unwanted physical touchings by a male boss towards a junior female employee not only constitute unlawful conduct under the civil anti-discrimination laws, but also are actionable under criminal laws for assault and battery.

46.      Without question, by the time Ms. Doe 1 started in June 2020, employees in supervisory positions at McAdam Financial personally witnessed Norfleet's conduct during his 3 years of employment, heard reports about it from other employees, or both.

47.     Nothing was done to remediate Norfleet's ongoing unlawful conduct.

48.     One reason nothing was done about it was because other male managers also engaged in unlawful conduct, including with Norfleet.  Specifically, female employees talked about the regular group chats between Norfleet, Swenson, Helmus and Wilson that were held as part of the ordinary course of business at McAdam Financial.

49.     The reason female employees talked about it, including with Ms. Doe 1, was that it was well known at the Company, that these four men, all in supervisory positions, often discussed and exchanged banter about the appearances of their female coworkers.

50.     Undoubtedly, these verbal exchanges were of a sexualized nature.  There is simply no business-related reason for a group of men, who worked at a <u>finance</u> company, to engage in regular group chats about the physical looks of female employees.

51.     Worse, it is clear that no effort was made to hide such discussions, causing female employees to have to report to men whom they knew were likely talking about their physical appearances.  Such body shaming and gender bias has no place in a professional company.

52.     Upon belief, this behavior was ongoing for at least three years, if not longer.

53.     If female employees tolerated such unwelcome conduct in silence, the *quid pro quo* was understood - they could continue to work alongside their male peers without further barriers to their success.

54.     At McAdam Financial, all the managers training the young advisors, including Ms. Doe 1, were men, and at least in the Boston office, the same men who openly engaged in conversations about the physical appearances of women.  Indeed, all the senior, most successful, managers at McAdam Financial were men.  Like any employee, Ms. Doe 1 could not help but notice.

55.     However, grateful for the opportunity to work as a financial advisor and prove her value, she knew that raising the issue of gender disparity among managers would do nothing except make her advancement harder.

56.     In fact, regarding Norfleet specifically, he had assisted Jane Doe 1 with obtaining two clients.  As a junior advisor, this was extremely beneficial help that resulted in increased

financial earnings for Ms. Doe 1, and further helped her to grow her book of business by attracting other clients, and therefore advancing at McAdam Financial.

57.     As a top sales manager in the Boston office, Norfleet was in a position to provide assistance to employees that he wanted to help, and he did help Ms. Doe 1.

58.     Another example showing a workplace rife with sexual innuendos took place in the fall of 2020.  Specifically, a female employee said during a meeting that she "would do anything" in reference to a specific item.  In response, Phil Kasden ("Kasden"), 47, another Financial Advisor, disgustingly responded, "Oh, you would do ***anything*** for [the item]?"

59.     This sexually suggestive response, in front of other employees, was humiliating for the female employee, and various employees took note of it.  Most of the new junior advisors such as Ms. Doe 1 were more than 20 years younger than Kasden, making his conduct more likely to go unchecked absent management protocols in place.

60.     Sadly, McAdam's management was made aware of this incident, but no remedial action was taken.

61.     Such inappropriate and sexually-driven behavior towards women at McAdams Financial was allowed to take place precisely because male employees understood that there would be no consequences for violating anti-discrimination statutes.  If anything, there may be laughs about it later on among the "men."

62.     Fostering this behavior through lack of accountability allowed a sexually hostile work environment to thrive.  It also paved the way for Norfleet to feel emboldened that horrific sexually assaulting conduct would be received with similar indifference by management.

**IV.    <u>Norfleet Rapes Ms. Doe 1</u>**

63.     After a year at the Company and following the increased vaccination rates, Ms. Doe 1 decided to go to the Boston office for some work meetings and to meet in person many of the co-

workers she had gotten to know over Zoom, including Norfleet, who had supervisory authority over Ms. Doe 1.

64.     On Friday morning, June 25, 2021, she took a train from Manhattan, where she resides, and went to the Boston office. That day after work, McAdam Financial hosted a work social event at a bar called Flight Club on Seaport Boulevard.  The event was held to celebrate achieving some internal goals.  Specifically, because one of the district managers, Swenson (Ms. Doe 1's direct manager), received a company bonus based on the numbers achieved by the junior employees, including Ms. Doe 1, he organized a celebratory outing.  Swenson said that he would use some of the bonus money to pay for everyone's drinks.

65.      That day, at approximately 4:00 p.m. about 18 employees went to the Flight Club. Ms. Doe 1, in an attempt to monitor her alcohol consumption, began by drinking beer.

66.     However, as the night progressed, Norfleet began feeding Ms. Doe 1 drinks, in an obvious attempt to get her intoxicated.  Norfleet engaged Ms. Doe 1 in a game of darts in another apparent effort to get close to her and lower her defenses.

67.     At some point the group of McAdam Financial employees left the Flight Club and went to another bar called Publico.  Once at Publico, Ms. Doe 1 felt her intoxication level increase dramatically.  Specifically, Ms. Doe 1 believes that she may have been drugged, or at the very least that she was supplied and urged to consume so much alcohol by Norfleet that she entered into a state that is commonly referred to as a "blackout."

68.     Ms. Doe 1's coworkers later informed Ms. Doe 1 that, while they were at Publico, Norfleet was "making out" with her at the bar, while she was clearly unable to understand or appreciate what was happening to her.

69.     Although Ms. Doe 1 has no memory of this, numerous employees of McAdam Financial observed and believed Ms. Doe 1 to be in an obviously intoxicated state.

70.     Employees, some of whom had supervisory authority over Ms. Doe 1, personally observed Norfleet taking advantage of his subordinate in this vulnerable condition and shockingly did nothing to intervene, including employees Hayley Tackett, Catherine Flugel, Alyson Dana and Jamie Espinola.

71.     Instead, multiple McAdam Financial employees, including some in supervisory positions, exhibited carelessness and disregard for Ms. Doe 1's wellbeing, as they witnessed Norfleet leaving the bar with Ms. Doe 1 in an inebriated state, clearly unable to consent, and did not intervene or try to stop their exit.

72.     No fewer than four current McAdam Financial employees saw Ms. Doe 1 leave with Norfleet and have since expressed their guilt and regret to Ms. Doe 1 for not stepping in to prevent what happened.

73.     The next morning, Ms. Doe 1 woke up naked in a strange bed.  It was clear to Ms. Doe 1 that Norfleet had raped her while she was either unconscious or completely unable to consent to or understand what was happening.

74.     When she woke up, she was confused, scared, embarrassed and in shock that she was in this situation with a supervisor.

75.     At that moment, while still trying to figure out where she was, Norfleet, like the sick predator that he is, climbed on top of Ms. Doe 1 and again raped her without her consent.

76.     Ms. Doe 1 was frozen, unable to react or respond and paralyzed by fear, confusion and a feeling of total helplessness.[12]

77.     During the sexual assault, Norfleet was completely silent.

---

[12]     Ms. Doe 1's response to the sexual assault by Norfleet is a common response to sexual assault experienced by many victims and labeled "tonic immobility" by several scientific studies. Francino Russo, *Sexual Assault May Trigger Involuntary Paralysis*, Scientific American, https://www.scientificamerican.com/article/sexual-assault-may-trigger-involuntary-paralysis/.

78.     When the rape had concluded, Ms. Doe 1 got up, but did not know where her clothing was.  Norfleet knew exactly where they were.  He went downstairs and retrieved them.  Ms. Doe 1 quickly put on her clothing and prepared to leave.

79.     She told Norfleet that she intended to walk home to her sister's apartment.

80.     Norfleet insisted that her sister's apartment was too far away and called an Uber for her.

81.     When Ms. Doe 1 left Norfleet's apartment, she immediately began to fear for her employment and status at McAdam Financial.  After all, Norfleet was her supervisor and had a substantial impact on her ability to make money in her commission-based role at the Company.  He was a top producing manager and already had helped her improve her sales techniques and earn commissions.

82.     That day, Saturday June 26, 2021, she took a train back home to Manhattan.

83.     Once home, Ms. Doe 1 took Plan B (Levonorgestrel) to prevent herself from being even further victimized by Norfleet.

84.     In an effort to protect herself and gauge his disposition towards her, Ms. Doe 1 engaged in a casual text conversation with Norfleet so that he would not take any negative employment action against her after the assault.  This also is a common reaction by women that have been sexually assaulted in the workplace.

## V.     Ms. Doe 1 Reported Norfleet's Conduct

85.     On June 29, 2021, Ms. Doe 1 bravely disclosed the sexual assault in detail to Swenson, her direct supervisor.

86.     Swenson said, "You need to talk with our VP [meaning Joseph MacDonald] to handle this.  I individually cannot."

87.     This forced Ms. Doe 1 to recount the sexual assault again to another man, retraumatizing her on the heels of this horrendous event.

88.     Nevertheless, determined to take action regarding her rape by a male supervisor, Ms. Doe 1 related the events in detail to Joseph MacDonald ("MacDonald"), 27, Vice President. Disturbingly, it became apparent to Ms. Doe 1 during this conversation that others had already told MacDonald that she had "gone home with" Norfleet.

89.     This still was not enough "reporting" for McAdam Financial.

90.     Appallingly, MacDonald decided that Ms. Doe 1 would have to recount these events a third time to the COO Jack McAdam ("McAdam"), age 42.  The COO is the brother of the founder of the Company, Michael McAdam.

91.     MacDonald told Ms. Doe 1, "You can speak with him as soon as possible or whenever you are ready, you don't need to talk with him, however you feel."  The wording used by MacDonald made Ms. Doe 1 uncomfortable.  It suggested the possibility of nothing happening at all if she did not speak with McAdam, an option completely unacceptable to Ms. Doe 1.

92.     Ms. Doe 1 remained brave despite her growing fear for her employment and status at McAdam Financial because she dared to report Norfleet.

93.     After all, Norfleet was a supervisor, including over her weekly ongoing sales training, and he had helped her gain two clients.  Therefore, Norfleet had a substantial impact on her ability to make money in her commission-based role at the Company.

94.     Also on June 29, 2021, Ms. Doe 1 participated in a video call with several women on the team.  The women expressed their regret about what had happened to Ms. Doe 1, and two of the women told Ms. Doe 1 that Norfleet had touched them inappropriately the night that she had been assaulted, with one of them remarking that it had been "before [Norfleet] latched onto [Ms. Doe 1.]"

95.     Also during that call, Ms. Doe 1 learned more disturbing allegations regarding Norfleet.  Until approximately one month prior to the assault, Norfleet was in a committed relationship.  Norfleet would regularly make comments about the fact that his girlfriend was annoying and expressed irritation with her.  On one occasion, Norfleet said to one female coworker, Ms. Doe 2, "I have always been interested in you."  After Norfleet's relationship with his girlfriend ended, his interest in her sexually escalated.

96.     On this video call, the women recounted that, approximately two weeks prior to Ms. Doe 1's assault, a number of McAdam employees participated in a Company-sponsored kickball game.  After the game, these employees went out drinking.  One woman, Ms. Doe 2, told Ms. Doe 1 that, at the bar after the game, Norfleet was "touching her in a way that made her feel uncomfortable."  She said that he had grabbed her waist, touched her back and was "feeling her up."  Another employee, Jane Doe 3, said that she had the exact same experience that night with Norfleet.

97.     Supervisory employees were present at this Company-sponsored kickball event.

98.     Upon information and belief, supervisory employees observed Norfleet's unwelcome sexual touchings of these two female employees at this event.

99.     Nothing was done.  Despite notice of Norfleet's conduct, McAdam Financial knowingly failed to take any remedial action or to conduct an investigation that could have prevented the harm that Plaintiff experienced.

100.    Appallingly, also on this call Ms. Doe 1 learned that on the night of the kickball game, Ms. Doe 2 had almost the identical experience as Ms. Doe 1.  Ms. Doe 2 recounted for Ms. Doe 1 that she had lost her memory for part of that night.  Ms. Doe 2 told Ms. Doe 1 that she does not remember going home with Norfleet, but that she recalls waking up naked in his bed.  Ms. Doe 2 was upset and confused, and, as he did with Ms. Doe 1, Norfleet climbed on top of Ms. Doe 2,

and raped her again as she lay frozen.  Ms. Doe 2 similarly got up and was unable to find her clothes.  Like Ms. Doe 1, Ms. Doe 2's clothes were downstairs in Norfleet's home.

101.    On this call in which Ms. Doe 2 discussed the acts of sexual violence that occurred two weeks before Norfleet's attack on Ms. Doe 1, was at least one female employee who worked in a supervisory position at McAdam Financial.

102.    Ms. Doe 1 does not know whether others at McAdam Financial knew about Norfleet's serious, heinous incident regarding Jane Doe 2 prior to this call.

103.    Regardless, at a minimum McAdam Financial already was under a duty to investigate Norfleet based on his ongoing conduct with male co-workers and their banter about female appearances, as well as his blatant physical touchings of female employees on numerous occasions.

104.    On June 30, 2021, still not being contacted by the COO McAdam, Ms. Doe 1 called him in order to report, once again, what Norfleet had done.

105.    On July 2, 2021, Ms. Doe 1 began seeing a therapist due to the trauma she had experienced.

106.    A week later, on July 6, 2021, McAdam told Ms. Doe 1 that the Company had not come to a resolution but that it would by July 9, 2021.

107.    McAdam offered that McAdam Financial would pay for Ms. Doe 1's therapy sessions.

108.    That same day, through a co-worker, Norfleet asked Ms. Doe 1 if she would speak with him.  Ms. Doe 1 unambiguously said that she was not comfortable speaking with Norfleet.

109.    On July 12, 2021, McAdam called Ms. Doe 1 and said that Norfleet is no longer affiliated with the Company.

110.    While Norfleet of course had to be terminated, it cannot possibly repair the tremendous harm suffered by Ms. Doe 1.

111.    Indeed, Ms. Doe 1 has been and will continue to seek therapy as a result of the trauma inflicted by a male supervisor, Norfleet, who raped her.

112.    However, McAdam Financial did not follow through with its promise to reimburse Ms. Doe 1 for her therapy costs.  Indeed, following Ms. Doe 1's hiring of legal counsel, McAdam Financial decided to pretend as if it had never made the promise in the first place and, in retaliation for asserting claims of discrimination, sexual assault and harassment, refused to make good on the promise to reimburse her therapy costs.

113.    Also following notice of Ms. Doe 1's hiring of counsel, McAdam Financial accused Plaintiff of certain licensing noncompliance.  Such accusations were in retaliation for her reporting Norfleet's conduct.

114.    Not only had one of its managers raped Ms. Doe 1, but following her reporting to senior management about the rape, as she was required to do, McAdam Financial was retaliating against her.

115.    Further, employees knew what had happened and were speaking negatively about Ms. Doe 1.

116.    Additionally, although it was bad enough that the details about what Norfleet had done to Ms. Doe 1 were known throughout the office, and management was retaliating against her, the situation was worse because Ms. Doe 1 was being blamed for Norfleet's termination.  Ms. Doe 1 believed that some employees were upset that Norfleet had been fired.  Specifically, Norfleet was a top sales manager for the Boston office and had assisted many new advisors with gaining clients and growing their book of business.  As such, his departure hurt the Company's bottom line, and therefore directly impacted employees.

117.   Being blamed for what happened and victimized a second time made Ms. Doe 1's work at McAdam Financial intolerable.  No reasonable female employee in her situation could continue to work under the circumstances.  Ms. Doe 1 had no choice but to resign.

118.    Following the heinous assault by Norfleet, Ms. Doe 1 reported the incident to the Boston Police Department.

119.   Ms. Doe 1 was subjected to a criminal level of abuse at the hands of Norfleet, and McAdam Financial, for its part, is strictly liable for the actions of former Lead Senior Manager Charles Norfleet.

### FIRST CAUSE OF ACTION
**(Discrimination in Violation of Title VII)**
*Against Defendant McAdam Financial*

120.   Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

121.   Defendant has discriminated against Plaintiff on the basis of her gender in violation of the Title VII by subjecting Plaintiff to disparate treatment based upon her gender including, but not limited to, subjecting her to sexual assault, harassment, *quid pro quo* and hostile work environment discrimination.

122.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

123.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

124.    Defendant's unlawful discriminatory actions constitute malicious, willful and wanton violations of Title VII for which Plaintiff is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of Title VII)
*Against McAdam Financial*

125.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

126.     By the actions described above, among others, Defendant retaliated against Plaintiff on the basis of her protected status in violation of Title VII after she complained of the sexual assault at the hands of Defendant Norfleet, a supervisor.

127.     As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of monetary damages and other relief.

128.     As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

129.     Defendant's unlawful retaliatory actions constitute malicious, willful and wanton violations of Title VII for which Plaintiff is entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION
### (Hostile Work Environment, Sexual Harassment and Gender Discrimination Under the NYSHRL)
*Against All Defendants*

130.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

131.     Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by subjecting Plaintiff to disparate treatment based upon her gender including, but not limited to, subjecting her to sexual assault, harassment, *quid pro quo* and hostile work environment discrimination.

19

132.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

133.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

## FOURTH CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
#### *Against All Defendants*

134.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

135.     By the actions described above, among others, Defendant retaliated against Plaintiff on the basis of her protected status in violation of the NYSHRL after she complained of the sexual assault at the hands of Defendant Norfleet, a supervisor.

136.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of monetary damages and other relief.

137.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

**FIFTH CAUSE OF ACTION**
**(Hostile Work Environment, Sexual Harassment and Gender Discrimination Under the NYCHRL)**
***Against All Defendants***

138.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

139.    Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by subjecting Plaintiff to disparate treatment based upon her gender including, but not limited to, subjecting her to sexual assault, harassment, *quid pro quo* and hostile work environment discrimination.

140.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

141.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

142.    Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYCHRL)**
***Against All Defendants***

143.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

144.    By the actions described above, among others, Defendant retaliated against Plaintiff on the basis of her protected status in violation of the NYCHRL after she complained of the sexual assault at the hands of Defendant Norfleet, a supervisor.

145.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

146.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

147.    Defendants' unlawful and retaliatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

<u>SEVENTH CAUSE OF ACTION</u>
**(Gender-Motivated Violence Pursuant to NYC Admin. Code §§ 8-901, *et seq*.)**
***Against Defendant Norfleet***

148.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

149.    The above-described conduct of Defendant Norfleet, including, but not limited to, Defendant Norfleet's sexual assault of Plaintiff, constitutes a "crime of violence" and a "crime of violence motivated by gender" against Plaintiff as defined by NYC Admin. Code § 8- 903.

150.    The above-described conduct of Defendant Norfleet, including, but not limited to, Defendant Norfleet's sexual assault of Plaintiff, constitutes a "crime of violence" against Plaintiff motivated: (i) by her gender; (ii) on the basis of her gender; and/or (iii) due, at least in part, to an animus based on her gender.

151.    Defendant Norfleet committed a "crime of violence" against Plaintiff because she is a woman and, at least in part, because he has an animus towards women. Defendant Norfleet's gender-motivated animus towards women is demonstrated by, among other things, his sexually violent treatment of women.

152.    As a direct and proximate result of the aforementioned gender-motivated violence, Plaintiff has sustained in the past, and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory damages.

153.    Defendant Norfleet's gender-motivated violence against Plaintiff entitles her to punitive damages and an award of attorneys' fees and costs.

**EIGHTH CAUSE OF ACTION**
**(Violation of Massachusetts Civil Rights Act (M.G.L.A. 12 § 11H))**
***Against Defendant Norfleet***

154.    Plaintiff realleges and reasserts each and every allegation in the preceding paragraphs as if set forth fully herein.

155.    Defendant Norfleet's violent sexual acts interfered with the exercise and enjoyment of Plaintiff's state and federal constitutional rights through biased-motivated threats, intimidation and/or coercion.

156.    Defendant Norfleet's violent sexual conduct was coercive due to the application of physical and/or moral force to constrain Plaintiff to do something she would not otherwise have done.

157.    Accordingly, Plaintiff is entitled to injunctive relief and any other appropriate equitable remedy the court sees fit in order to protect the peaceable exercise of the rights secured by the Commonwealth and Federal Constitution.

**NINTH CAUSE OF ACTION**
**(Negligence, Negligent Supervision and Negligent Retention)**
*Against Defendant McAdam Financial*

158.    Plaintiff realleges and reassert s each of the preceding paragraphs as if fully set forth herein.

159.    Defendant McAdam Financial owed Plaintiff a duty of reasonable care in the supervision and retention of its employees.

160.    Defendant McAdam Financial did breach that duty of care in the retention and/or supervision of Defendant Norfleet who was unfit to be employed and who was not adequately supervised during his employment.

161.    Defendant McAdam Financial knew, or should have known, that Defendant Norfleet had previously sexually harassed and/or assaulted other female employees during the course of his employment.

162.    Defendant McAdam Financial failed to take any remedial action against Defendant Norfleet, allowing his conduct to continue unabated, which directly allowed his rape of Plaintiff to occur.

163.    Defendant McAdam Financial knew or reasonably should have known that Defendant Norfleet was unfit and a potential danger to other female employees, yet Defendant McAdam Financial continue to employ Defendant Norfleet with a conscious disregard of the rights or safety of others, including Plaintiff, to warrant the imposition of punitive damages.

164.    Defendant McAdam Financial knew or should have known that its negligence and breach of duty of care would cause or had a substantial probability of causing severe emotional distress to Plaintiff, and in fact did cause her severe emotional distress.

165.    Accordingly, Plaintiff is entitled to recovery against Defendant in an amount to be determined at trial.

## TENTH CAUSE OF ACTION
### (Assault)
### *Against Defendant Norfleet*

166.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

167.    The violent sexual acts committed intentionally by Defendant Norfleet against Plaintiff and without her consent, including, but not limited to, his sexual assault of Plaintiff, created a reasonable apprehension in Plaintiff of immediate harmful or offensive contact to Plaintiff's person.

168.    As a direct and proximate result of the aforementioned assault, Plaintiff has sustained in the past, and will continue to sustain, inter alia, physical injury, monetary damages, pain and suffering, psychological and emotional distress, humiliation and loss of career fulfillment.

169.    Defendant Norfleet's conduct was wanton, malicious, willful and/or cruel, entitling Plaintiff to an award of punitive damages.

## ELEVENTH CAUSE OF ACTION
### (Battery)
### *Against Defendant Norfleet*

170.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

171.    The violent sexual acts committed intentionally by Defendant Norfleet against Plaintiff and without her consent, including, but not limited to, his sexual assault of Plaintiff, constitutes a harmful and offensive contact to Plaintiff's person.

172.    As a direct and proximate result of the aforementioned assault, Plaintiff has sustained in the past, and will sustain in the future, inter alia, physical injury, monetary damages, pain and suffering, psychological and emotional distress, mental anguish, embarrassment,

humiliation and loss of career fulfillment.

173.     Defendant Norfleet's conduct was wanton, malicious, willful and/or cruel, entitling

Plaintiff to an award of punitive damages.

**TWELFTH CAUSE OF ACTION**
**(Intentional Infliction of Emotional Distress)**
***Against Defendant Norfleet***

174.     Plaintiff realleges and reassert each of the preceding paragraphs as if fully set

forth herein.

175.     Defendant's employees, while carrying out their job duties, engaged in conduct

toward Plaintiff that is extreme and outrageous so as to exceed the bounds of decency in a civilized

society.

176.     Defendant McAdam Financial is liable for the actions of its agents and employees

directly and under the doctrine of respondeat superior.

177.     Defendant McAdam Financial is vicariously liable for its employees' and agents'

intentional and negligent torts, whether or not such acts were committed within the scope of

employment.

178.     Defendant McAdam Financial breached its duty of care in its actions towards

Plaintiff.  The aforementioned events took place due to the negligent acts and/or omissions of

Defendant and its agents, servants, employees and or licensees, all of whom were acting within

the scope of their authority, within the scope of and in furtherance of their employment, and in

furtherance of their agency.

179.     By his actions and conduct, Defendant's employee Norfleet intended to and did

intentionally and recklessly cause Plaintiff to suffer severe emotional distress.

180.     As a direct and proximate result of Defendant's employee's conduct, Plaintiff has

suffered, and continues to suffer, severe emotional distress, for which she is entitled to an award

26

of damages.

181.     The conduct of Defendants was engaged in with fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of Plaintiff, so as to warrant the imposition of punitive damages.

182.     Accordingly, Plaintiff is entitled to recovery against Defendants in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.     A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, New York State and the State of Massachusetts;

B.     An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.     An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

D.     An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her emotional distress;

E.     An award of damages for any and all other monetary and/or non-monetary losses

suffered by Plaintiff, including, but not limited to, loss of income, reputational harm and harm to professional reputation, in an amount to be determined at trial, plus prejudgment interest;

F.      An award of punitive damages, and any applicable penalties and/or liquidated damages in an amount to be determined at trial;

G.      Prejudgment interest on all amounts due;

H.      An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and,

I.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.


Dated: January 6, 2022
     New York, New York          Respectfully submitted,

          **WIGDOR LLP**


By: _____
          Jeanne M. Christensen
          Lindsay M. Goldbrum

          85 Fifth Avenue
          New York, NY  10003
          Telephone: (212) 257-6800
          Facsimile: (212) 257-6845
          jchristensen@wigdorlaw.com
          lgoldbrum@wigdorlaw.com

          *Counsel for Plaintiff*